# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                  :       APPEAL NO.    C-250584

                                     TRIAL NO.     25/CRB/12997/A

      Plaintiff-Appellee,          :

  vs.                                :

SARAH R. PITTS,             :            *JUDGMENT ENTRY*

      Defendant-Appellant.       :

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/18/2026 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *State v. Pitts*, 2026-Ohio-2306.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,               :      APPEAL NO.   C-250584
                                    TRIAL NO.    25/CRB/12997/A
    Plaintiff-Appellee,      :

 vs.                          :
                                           *O P I N I O N*
SARAH R. PITTS,              :

    Defendant-Appellant.     :


Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 18, 2026


*Emily Smart Woerner*, City Solicitor, *Susan Zurface,* Chief Prosecuting Attorney, and *Meagan W. Myers,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1} Sarah R. Pitts appeals her conviction, after a bench trial, for assault. In one assignment of error, Pitts argues that the trial court erred in convicting her of assault as she acted in self-defense. For the following reasons, we affirm the judgment of the trial court.

## Factual Background

{¶2} Sarah R. Pitts was charged with assault, menacing, and domestic violence after an altercation with her former girlfriend R.N. and R.N.'s new girlfriend. Pitts pled not guilty and proceeded to a bench trial.

{¶3} The new girlfriend testified that she had met R.N. on Facebook in May. After speaking for a week on Facebook, they decided to meet. After their first meeting, they began to date. On July 29, to celebrate R.N.'s birthday, the new girlfriend purchased gifts and a cake to surprise her. After a celebratory dinner, they returned to R.N.'s home to Facetime R.N.'s sister, sing "Happy Birthday," and enjoy the cake.

{¶4} They retired to the bedroom and sat on the bed talking. While on the phone with her father around 10 p.m., R.N. received a phone-camera notification that Pitts had walked up to her front door and knocked. When R.N. walked out of the bedroom, leaving the new girlfriend on the bed, Pitts walked up the stairs and came into the bedroom. The bed was facing the door, and the new girlfriend was lying on the left side of the bed.

{¶5} The new girlfriend described Pitts as physically and verbally aggressive. Pitts was yelling at her, demanding she leave the home, and coming toward her. Pitts called her the "B-word" and told her to get out of her house. Pitts grabbed a tall, standing metal fan that was on the left side of the bed. The new girlfriend estimated that the fan weighed 35-40 pounds. Pitts swung the fan at her, and the new girlfriend

blocked it with her right forearm and hand. She felt throbbing pain from the impact and had to ice her arm and hand that night. The new girlfriend also took ibuprofen to calm the pain.

{¶6} At that point, the new girlfriend was in defense mode. She kicked Pitts who continued to move aggressively toward her. R.N. tried to grab the fan away from Pitts and hold her down. Pitts got up and grabbed a lamp from the nightstand next to the new girlfriend. R.N. managed to take the lamp from Pitts and pin her down. R.N. told the new girlfriend to go downstairs and go outside.

{¶7} The new girlfriend went onto the right side of the bed, grabbed her phone, and called the police. While walking down the stairs, the new girlfriend was talking to the police. She told the police that both she and R.N. were in danger, and that R.N. was trying to calm Pitts. The police instructed her to walk outside if she did not feel safe, and she followed their instructions.

{¶8} When the new girlfriend awoke the next day, she had a bruise on her left knee, which she photographed. She also had scratches on her neck that occurred when she was defending herself from Pitts's attack. Pitts had attempted to grab her face, and when the new girlfriend backed up, Pitts scratched her neck. The new girlfriend testified that she felt a burning sensation from the scratches that hurt. She treated the scratches with ointment. The State submitted a photo of the scratches on her neck. The new girlfriend confirmed that Pitts hit her with the fan before she kicked Pitts.

{¶9} R.N. testified that after returning home from dinner, she and the new girlfriend ate the birthday cake, and her mom and sister sang "Happy Birthday" to her. They went upstairs, and R.N. was on the phone with her father when she saw Pitts come to her front door through her camera. Pitts went to the back of the house and opened the back door. Pitts had been there earlier, and at that time, R.N. had asked

4

the new girlfriend if she had locked the back door. The new girlfriend said yes, but hesitated, so R.N. was going to go check to ensure the door was locked, but she forgot.

{¶10} While still on the phone, R.N. set her cake down and went to the stairs. By the time she got there, Pitts was there. The new girlfriend was still sitting on the bed when Pitts came in and told her to "get this B out of my house." Pitts kept repeating it, and R.N. did not know what to do. The house belonged to R.N., and she lived there with her two dogs. R.N. had allowed Pitts to have her mail sent to R.N.'s house and leave some of her belongings there because Pitts was a traveling nurse and was always gone. R.N. had had an on-and-off relationship with Pitts for the past three years. When asked if the two were currently dating, R.N. responded, "It depends on how we feel, what – you know."

{¶11} Pitts continued to demand that the new girlfriend leave the home, and the new girlfriend said that Pitts was no longer dating R.N. Pitts started walking toward the new girlfriend, who leaned back and started kicking. Pitts picked up a fan and tried to hit the new girlfriend with it. Pitts tried to reach the new girlfriend, and the new girlfriend tried to grab the fan. R.N. pushed Pitts onto the futon and fell on top of her. R.N. told the new girlfriend to go downstairs, and the new girlfriend called the police. R.N. and Pitts stayed in the bedroom for about ten-15 minutes then went out the back door.

{¶12} R.N. gave a statement to the officers that night, and the statement was admitted as an exhibit. R.N. was confronted with the fact that her testimony did not match her statement because she told the police that Pitts swung the fan before the new girlfriend began kicking. R.N. responded that she did not write the action word-for-word how it actually happened. She further explained that her sister and neighbor were "in her face" and she had anxiety that night.

{¶13} The State sought permission to treat her as a hostile witness, which the court allowed. R.N.'s statement said,

> I, [R.N.] saw [Pitts] open up a side door and enter my house. [Pitts] came up my stairs and attacked [the new girlfriend], punching her and then picked up a fan and then tried to hit [the new girlfriend] in the head. I, [R.N.] grabbed her to stop. [Pitts] then picked up my lamp and swung the lamp at [the new girlfriend's] head. I, [R.N.] grabbed [Pitts] so that [the new girlfriend] could get out through. [Pitts] then left out of the room and went outside. I told [the new girlfriend] to get out of the house.

{¶14} R.N. confirmed that she wrote the statement, but she was "dumbing it down" and there was so much going on. When asked whether a complaint was filed against Pitts for domestic violence and menacing for threatening to beat R.N.'s ass, causing R.N. to believe Pitts would cause her physical harm, R.N. responded, "No, I don't remember that."

{¶15} On cross-examination, R.N. testified that Pitts "didn't really get to punch" the new girlfriend, and "didn't get a connect" and "she didn't really-she didn't make contact with [the new girlfriend's] face, not no fist balled up that I seen." When asked who struck whom first, R.N. replied, "[The new girlfriend] leaned back on the bed and started kicking her legs." That's when R.N. saw Pitts pick up the fan, and R.N. knocked the fan out of Pitts's hand. R.N. said that Pitts sometimes stayed with her when she was in town. When R.N. gets mad at her they break up and then when she is back in town, they may make up.

{¶16} The court asked R.N. what Pitts did to cause the new girlfriend to start kicking. R.N. stated that Pitts was rapidly advancing on her and telling her to "get out

of my house." R.N. testified that Pitts was mad and aggressive. Pitts approached the new girlfriend after she reminded Pitts that she was no longer dating R.N.

{¶17} The responding officer testified he responded to a domestic-violence call. The new girlfriend was shaken like she had just been in a fight. She was wearing a black nightie and holding her right arm as though it were tender. The officer took a photo of her neck. After the officer took the new girlfriend's statement, R.N. came out of the house, and the officers separated the two to get both statements. He spoke with R.N.

{¶18} When he asked R.N. what happened, her initial statement was, "Whatever [the new girlfriend] said." R.N. had not heard what the new girlfriend had said, so the officer sought a more concrete statement. After the officer explained that R.N. told him that Pitts picked up a big, metal fan, Pitts objected to any hearsay statements, which the court sustained.

{¶19} Twice during the police investigation, Pitts called R.N. The officers instructed R.N. not to tell Pitts that the police were there and asked R.N. to put Pitts on speaker phone. A voice that R.N. referred to as Pitts repeatedly said, "I will beat your ass." Based on R.N.'s statements, the officer decided to arrest Pitts for domestic violence and menacing. The assault charge was based on the new girlfriend's statement about the fan, the complaint of pain, and the scrape on her neck.

{¶20} Based on Pitts's phone statements, the officers believed she was still in the area, so they drove around the area. They located her vehicle, which was illegally parked, so the officers initiated a tow. As they were driving to file the charges, they saw Pitts speaking with R.N. Pitts was verbally combative.

{¶21} The State rested, and the trial court granted Pitts's motion to dismiss the menacing and domestic-violence charges for lack of evidence.

{¶22} Pitts testified that she texted R.N. "Happy Birthday" and told her that she loved her. R.N. responded, "I love you too." Pitts decided to call R.N., and when R.N. did not answer, Pitts went to her home. The key fob on the front door was dead, so Pitts went to the backyard, and the door was unlocked. She walked in and went upstairs. R.N. met her at the bedroom door, and they went into the bedroom. Initially, she did not see the new girlfriend. When she did, she told R.N. to "get this bitch out of my house." Pitts was hurt and angry because she had no idea R.N. was dating someone. She continued to tell R.N. to get her out of the house when the new girlfriend stood up and said, "You all not even together." Pitts responded, "Listen [new girlfriend], I am not talking to you. I am talking to [R.N.]."

{¶23} As she walked toward the bed, the new girlfriend kicked her. After the new girlfriend starting kicking her, Pitts tried to hit her with the fan, but R.N. stepped in between the two and took the fan. Then Pitts picked up the lamp and hit the new girlfriend with the lamp. R.N. took the lamp and threw it down then pushed her back and held her down. The new girlfriend went downstairs.

{¶24} On cross-examination, Pitts testified that she had been living with R.N., but was now homeless. Pitts acknowledged R.N. owned the home, and that she was not living with R.N. at the time, but she would go there. Pitts and R.N. had separated in May. Currently, they were back together. Pitts was surprised and hurt to find another person in the bedroom and had a verbal altercation with R.N. Pitts admitted picking up the fan, but she denied hitting the new girlfriend with it. Pitts wished she had hit her because the new girlfriend kicked her.

{¶25} The trial court found that Pitts was advancing on the new girlfriend, and the new girlfriend acted in self-defense. The court further found "objective evidence of injury to [the new girlfriend]," and found Pitts guilty.

{¶26} Pitts now appeals, and in one assignment of error, she argues that the trial court erred in finding her guilty because she acted in self-defense.

**Self-defense**

{¶27} A claim that the State failed to disprove self-defense is reviewed under the manifest-weight standard. *State v. Nichols*, 2025-Ohio-1515, ¶ 18 (1st Dist.), citing *State v. Mitchell*, 2023-Ohio-2604, ¶ 13 (1st Dist.); *State v. Smiley*, 2025-Ohio-2666, ¶ 19 (5th Dist.). In reviewing a manifest-weight challenge, an appellate court reviews the entire record, weighs the evidence and all of the reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "When confronted with conflicting evidence, we interpret the evidence in a manner consistent with the trial court's judgment." *State v. Rose*, 2024-Ohio-5689, ¶ 23 (1st Dist.), citing *In re J.C.*, 2019-Ohio-4027, ¶ 20 (1st Dist.).

{¶28} Assault in violation of R.C. 2903.13(A) occurs where a person "knowingly cause[s] or attempt[s] to cause physical harm to another. . . ." R.C. 2903.13(A). The State also had the burden of proving beyond a reasonable doubt that the accused did not act in self-defense. *See* R.C. 2901.05(B)(1).

{¶29} In a case involving the use of nondeadly force, an accused is justified in using force against another if (1) she was not at fault in creating the situation giving rise to the altercation and (2) she had reasonable grounds to believe and an honest belief, even though mistaken, that she was in imminent danger of bodily harm and her only means to protect herself from the danger was by the use of force not likely to cause death or great bodily harm. *See State v. Ridley*, 2022-Ohio-2561, ¶ 15 (1st Dist.).

9

{¶30} The State need only disprove one of the elements of self-defense, beyond a reasonable doubt at trial, to sustain its burden. *State v. Smith*, 2026-Ohio-1262, ¶ 39 (1st Dist.), citing *Nichols*, 2025-Ohio-1515, at ¶ 25 (1st Dist.). "A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." *Nichols* at ¶ 25. An initial aggressor can be the person whose wrongful behavior provoked the assault. *See Rose*, 2024-Ohio-5689, at ¶ 28 (1st Dist.). An accused is "at fault" in causing the altercation if she knowingly and voluntarily enters a place or situation where a victim is located, or if she refuses to leave such a space. *State v. Patterson*, 2025-Ohio-280, ¶ 41 (10th Dist.), citing *State v. Ellis*, 2012-Ohio-3586, ¶ 15 (10th Dist.); *State v. Walker*, 2021-Ohio-2037, ¶ 19 (8th Dist.) ("Generally, a defendant, having willingly advanced toward a volatile situation cannot rely on the affirmative defense of self-defense.").

{¶31} Pitts argues that the court erred in finding her guilty because both R.N. and Pitts testified that the new girlfriend kicked Pitts first, and therefore, was the initial aggressor.

{¶32} Here, all of the witnesses who were present during the altercation testified that Pitts entered the home through an unlocked door and proceeded upstairs and into R.N.'s bedroom. All agreed that Pitts was angry and aggressive, repeatedly stated, "get this B out of my house," and approached the new girlfriend who was in R.N.'s bed.

{¶33} The new girlfriend testified that Pitts approached her and grabbed a heavy metal fan and began swinging it toward her, and both R.N. and Pitts gave similar testimony. The new girlfriend testified that she blocked the fan with her arm, suffering an injury, while R.N. and Pitts claimed that Pitts was unable to strike the new girlfriend with the fan. However, the first responding officer testified that when he arrived, the

new girlfriend was holding her right arm as though it were tender. He further testified that the new girlfriend had scrapes on her neck which he photographed. On the night of the altercation, R.N. admitted that Pitts attacked the new girlfriend, punched her, and then picked up a fan and tried to hit her in the head.

{¶34} Based on this record, the trial court did not err in finding that Pitts was the initial aggressor, who advanced on the victim. "[A] defendant voluntarily participating in or initiating a confrontation, especially for purposes other than protection, cannot justify or excuse" her use of force. *See Rose*, 2024-Ohio-5689, at ¶ 28 (1st Dist.), quoting *State v. Smith*, 2021-Ohio-1185, ¶ 23 (8th Dist.).

{¶35} Moreover, "[s]elf-defense cases often come down to witness credibility." *Nichols*, 2025-Ohio-1515, at ¶ 27 (1st Dist.). Here, the trial court found that the new girlfriend acted in self-defense and suffered an injury, based on the photographic evidence. The trial court found the new girlfriend's testimony to be credible.

{¶36} Accordingly, we overrule the first assignment of error.

## Conclusion

{¶37} Having overruled Pitts's sole assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

**NESTOR** and **MOORE, JJ.,** concur.

11